The Honorable Jeremy Hutchinson State Representative 718 Parliament Street Little Rock, AR 72211
Dear Representative Hutchinson:
I am writing in response to your request for an opinion on the legality of an amateur poker league. Your request sets forth the factual background of your request including a brief overview of the poker league in question. Host establishments pay a fee to the league to have the tournaments hosted at their restaurants and bars. The players in the tournaments must register with the league. Registration costs nothing. There are no annual fees. There is no door fee to play in the tournaments hosted and no actual money is wagered in the tournaments. Rather, a number of poker chips are equally distributed to each participant and the participants are forbidden by league rules to wager any money or other item of value in the tournaments. The league has proposed awarding prizes to the winners of the tournaments. With this information as the background, you ask the following:
 1. Do the Arkansas anti-gambling statutes or the anti-lottery provision of the Arkansas Constitution prohibit the activities of the league described above, including hosting a poker tournament in which participants do not pay to participate and are prohibited from wagering, but have the ability to win a prize?
 2. Is the answer to question 1 different if the league does not award prizes or if the value of the prizes is less than a certain dollar amount?
 3. Are the answers to question 1 and 2 different if the game being played is something other than poker, such as Monopoly or Yahtzee?
RESPONSE
In my opinion, the activity of the league as described above would likely be found by a court to be neither a lottery as prohibited by the Arkansas Constitution nor illegal gambling prohibited under A.C.A. §§ 5-66-101
through -119 (Repl. 1997). Based on existing Arkansas law, it appears that such poker leagues may legally run tournaments of poker where the participants are able to win prizes so long as the prizes are not directly or indirectly paid for by the players, by means such as entrance fees to the tournament or membership fees to the league or otherwise. This same analysis would also apply to other games in addition to poker, such as bingo, blackjack, and so forth so long as the players do not make any direct or indirect payment for a chance to win. As noted below, only a court could fully analyze any particular set of facts to determine legality. And, of course, the enforcement of the laws against gambling fall within the authority of local prosecutors and enforcement of the regulations on establishments serving alcoholic beverages fall under the jurisdiction of the Arkansas Alcohol Beverage Control Board in the first instance. Anyone proposing to participate in such a game would be well-advised to contact the local prosecuting attorney and the Alcohol Beverage Control Board. In response to question 2, I direct you to my response to question 1. In response to question 3, I opine that the answer would be the same as the answers to Question 1 and Question 2.
Question 1. Do the Arkansas anti-gambling statutes or the anti-lotteryprovision of the Arkansas Constitution prohibit the activities of theleague described above, including hosting a poker tournament in whichparticipants do not pay to participate and are prohibited from wagering,but have the ability to win a prize?
I do not believe that the Arkansas anti-gambling statutes or the constitutional prohibition on lotteries prevent the activities of the league as you have described them.
In my opinion, the constitutional prohibition on lotteries does not apply to this situation. The Arkansas Constitution provides, "No lottery shall be authorized by the State, nor shall the sale of lottery tickets be allowed." Ark. Const. Art. 19, § 14. The Arkansas Supreme Court has defined a "lottery" as "a species of gaming which may be defined as a scheme for the distribution of prizes by chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize." Op. Att'y Gen. 2004-091 (citing Scott v. Dunaway,228 Ark. 943, 311 S.W.2d 305 (1958)); see also Shuffield v. Raney,226 Ark. 3, 287 S.W.2d 588
(1956); and Op. Att'y Gen. 2003-053. Under this definition, consideration must be paid to participate. See Op. Att'y Gen. 2002-240
(citing Scott, supra). Second, playing or participating in the game or contest creates a chance to win a prize. Id. Third, the game is controlled entirely by chance and winning is not influenced by the skill or judgment of those playing or participating. Id. "If, in a particular situation, one of these three elements is not present, then no lottery exists." Op. Att'y Gen. 86-599.
There does not appear to be consideration paid to participate in the poker tournaments as you have described the situation. Consideration may not be directly or indirectly contributed by the participants of the game or contest at issue. See, e.g. Op. Att'y Gen. 99-318. Direct contributions include such payments as a fee to participate in the game or contest. Id. You have described the situation as one where the players in the tournament do not pay a fee to participate in each tournament or otherwise directly contribute to the league. My predecessor noted that indirect consideration may exist when an organization that requires annual dues hosts a bingo night for its members. Op. Att'y Gen. 99-318. To participate in the game, a player had to either be a dues-paying member of the organization or the guest of a dues-paying member. Id. My predecessor opined that consideration for participation in the bingo game was met by the dues paying requirement. Id. Another method of indirectly offering consideration to participate in a game or contest of chance was recounted in Op. Att'y Gen. 93-364. A business or other hosting establishment offered "specials" in conjunction with the lottery activity. The participants paid consideration to participate in a lottery when, for example, they paid grossly inflated prices that bore a direct relationship to participating in the activity such as being allowed to play a "free bingo" game after purchasing a $.01 mint for $1.00 or being allowed to play a "free bingo game" but having to pay for a chair and table space to place the bingo card. Id. (citations omitted). I agree with and adopt my predecessors' opinions that indirect methods of payment such as annual fees or inflated prices for food and beverages may meet the consideration requirement in determining whether a constitutionally prohibited lottery exists.
It is ultimately a question of fact as to whether the participants are paying consideration to participate, but I do not believe that it is likely that a court would make such a finding on the facts as you have described them. The participants are not directly offering consideration to participate in the tournaments. There are no annual dues paid to the league. You note that the host establishments are hoping to profit from an increased volume of food and beverage sales. As long as the playing of the poker game is not dependent on the food and beverage sales, such as through but not limited to a minimum food or beverage requirement or cover charge, and so long as the participants are not indirectly paying consideration for a chance to win through inflated food and beverage prices which the host establishment uses to fund the purchase of the prizes, I do not believe that the participants are paying consideration to play in the tournament as you have described it.
With regard to the other two elements of a lottery, as you noted in your request, the league is considering awarding prizes at the tournaments. If the league were to award prizes, the "prize" element of lottery would therefore be met. I cannot conclusively address, however, whether poker would be considered a game controlled entirely by chance. The winners must be determined by "chance alone," and that the outcome be "wholly dependent upon the element of chance." Scott, 228 Ark. at 944 (citation omitted).[1] Your request for an opinion does not specify what exact type of poker game is to be played at the tournaments. However, an Arkansas Court has not determined whether any particular kind of poker is predominantly a game of chance with respect to the constitutional prohibition on lotteries. Only a factual finding by a court can properly determine whether poker is primarily a game of chance under Arkansas law. Because, however, there appears to be no consideration paid to participate in the poker tournaments at least one of the elements of a "lottery" is not present under the facts you describe. I therefore opine that the league, in the narrow factual situation you have described, is not violating the constitutional prohibition on lotteries.
The Arkansas Code prohibits gambling on poker games in Ark. Code Ann. § 5-66-112 (Repl. 1997). Specifically, the code provides:
 If any person shall be guilty of betting any money or any valuable thing on any game of brag, bluff, poker, seven-up, three-up, twenty-one, vingt-et-un, thirteen cards, the odd trick, forty-five, whist, or at any other game at cards, known by any name now known to the law, or with any other or new name or without any name, he shall, on conviction be fined in any sum not less than ten dollars ($10.00) nor more than twenty-five dollars ($25.00).
Id. (emphasis added). This statute makes it is illegal to bet with money or any other thing of value, directly or indirectly, on the outcome of a card game. As noted in the discussion of the constitutional prohibition on lotteries above, the situation as you have described does not appear to involve wagering on these games. Absent a wager, I believe that the Arkansas courts would not find this to be prohibited gambling.
In addition, I do not believe that the host establishments would be considered "gambling houses" under the Arkansas Code. The statutory prohibition on gambling includes a prohibition on the keeping of "gambling houses." Specifically, the code provides:
 Every person who shall keep, conduct, or operate, or who shall be interested, directly or indirectly, in keeping, conducting, or operating any gambling house or place where gambling is carried on, or who shall set-up, keep, exhibit or cause to be set up, kept, or exhibited . . . any gambling device, or who shall be interested directly, or indirectly in running any gambling house . . . either by furnishing money, or other articles for the purposes of carrying on any gambling house shall be deemed guilty of a felony and on conviction shall be confined in the Department of Correction for not less than one (1) nor more than three (3) years.
A.C.A. § 5-66-103 (Repl. 1997).
The Arkansas Supreme Court has explained that "the essence of the offense set out in § 5-66-103 is the keeping or maintaining of a house where those who wish to gamble may do so." McDougal v. State, 324 Ark. 354,358, 922 S.W.2d 323 (1996) (citation omitted). The Arkansas Code does not define the terms "gambling" or gaming." The Arkansas Supreme Court, however, has defined gambling as "the risking of money between two or more persons, on a contest or chance of any kind, where one must be the loser and the other gainer." Sharp v. State, 350 Ark. 529, 534,88 S.W.3d 848 (2002) (quoting Portis v. State, 27 Ark. 360 (1872). Furthermore, the court has treated the two terms as interchangeable.Id. Absent the risking of money or other valuable property in the outcome of a contest, there is no gambling. The Arkansas Supreme Court has thus long recognized that the anti-gambling laws do not prohibit allowing a game of poker to occur when there are no wagers. Ansley v. State,36 Ark. 67 (1880) (reversing the conviction of a tavern owner for allowing a poker game to occur on the premises when there was no wagering under a former statute prohibiting a tavern keeper from allowing a game of cards on the premises). In Ansley, the court stated "[t]he intention of the legislature was, we think, to prevent the playing of games for money, or other stake . . . and to suppress the pernicious vice of gambling — and not to prohibit the playing . . . of games merely for recreation or amusement." 36 Ark. at 67. As discussed above, the aspect of consideration or wagering of money seems to be lacking in the situation you have described. There does not, therefore, appear to be any gambling occurring as there does not appear to be a contest between either individual players or between the players and the league or establishment where one is the gainer and the other the loser. I, therefore, do not believe that the establishments hosting the tournaments would be considered gambling houses under A.C.A. § 5-66-103 in the situation you have described.
On a similar analysis, I do not believe that the host establishments would be considered to be exhibiting gaming devices under A.C.A. §§5-66-103, -104, or -107. Arkansas Code Annotated § 5-66-104 prohibits the keeping or exhibiting of "any gaming table or gambling device" which is "designed for the purpose of playing any game of chance, or at which any money or property may be won or lost." The distinct offense under A.C.A. § 5-66-107 prohibits the owner or occupant of a building from allowing gambling on the premises. As I noted above, there does not appear to be gambling in the situation you have described and the in Ansley, supra,
the Arkansas Court recognized that it was not an offense to allow a game of poker to occur when there was no gambling involved. I do not believe that the situation you have described would support finding the league or the host establishments as exhibiting gaming devices.
The host establishments where the poker tournaments are occurring are licensed by the Arkansas Alcohol Beverage Control Board ("ABC") according to your description. You have indicated that the ABC has "advised the League that their activities constituted gambling activities and could subject participating host establishments to disciplinary actions by ABC." The Arkansas Code prohibits certain licensed sellers of alcoholic beverages from allowing "gambling with cards . . . or any other form of gambling in the place designated by the license[.]" A.C.A. §3-5-221(d)(1)(A) (Repl. 1996). Furthermore, the Code also prohibits a licensed seller of beer from allowing "gambling or games of chance upon the licensed premises." A.C.A. § 3-5-307(5) (Repl. 1996). In another section of the Code, it is prohibited for a holder of a license for on-premises alcoholic consumption to "keep on the permitted premises a slot machine or any gambling or gaming device, machine, or apparatus[.]" A.C.A. § 3-9-236(15) (Repl. 1996). The Arkansas Alcohol Beverage Control Board Regulations specifically prohibit:
 Permitt[ing] gambling or games of chance or [keeping] any gambling device, machine, or apparatus upon the permitted premises[.]
Ark. Alcohol Bev. Control Reg. 3.19(1)(C).
As discussed above, I do not believe that the situation you have described would support a finding of gambling. Furthermore, I do not believe that the situation supports a finding that gambling devices are being kept or used on the host establishment premises. From my understanding, ABC has based its interpretation of the gambling statutes on language from Pre-Paid Solution v. City of Little Rock, 343 Ark. 317,34 S.W.3d 360 (2001), citing Rankin v. Mills Novelty Co., 182 Ark. 561,32 S.W.2d 161 (1930). In Pre-Paid, the Arkansas Supreme Court held that a pre-paid telephone card machine was a gambling device because of the game that could be played whenever a phone card was purchased. The device was described as:
 The machines operate as follows. A patron paces a $1 bill in the machine, and the machine prints an "Emergency Long Distance Telephone Card" good for three minutes of long distance. At the same time, the machine registers a number of play credits. The patron may then play a game on the machine "similar to tic-tac-toe on a 3 x 3 matrix consisting of various symbols which may be lined up for additional points." These points may then be redeemed for a cash prize ranging from $1 to $1,000. Additionally after using the prepaid telephone card, the patron may mail the used card to Appellants for a supplemental drawing for various prizes such as electronics or airline tickets. If a patron does not wish to purchase a telephone card but still wants to play the game, he or she may use one of the self-addressed, stamped post cards provided at the store and mail it to Appellants for a free-play certificate. A patron may then redeem the free-play certificate for a $1 bill to play the game.
Pre-Paid, 343 Ark. at 319. The court later noted that a patron could immediately redeem the points provided by the machine for a full refund of the money spent on the telephone card. Furthermore, the court noted that the game offered appeared "much like a slot machine." Id. at 322-23. The court held that the machine was a gambling device because it gave patrons the opportunity to win something in addition to the item initially purchased through a game of chance. The chance to play the game for additional reward after inserting compensation was held to be a "property right" in playing the game. Id. at 323. As I understand it, ABC has based its interpretation that the league is conducting gambling activities on this language stating that there is a property right to play the game that may be won or lost and this therefore amounts to wagering on the league tournaments.
I do not believe that ABC's interpretation of the language in Pre-Paid is appropriate under the situation you have described. With respect to the possible property interest in playing in the league tournaments, I believe that the lack of consideration to participate in the tournaments prevents a property interest, such as the one in Pre-Paid, supra, from being wagered. In Pre-Paid, 343 Ark., as well as Rankin, 182 Ark., the court was addressing a device where money had to be inserted for a product and also the opportunity to play a game where more prizes could be awarded. Furthermore, the court noted that, while the appellant in Pre-Paid
offered a chance to play the game for free, it involved giving a one dollar bill to the potential player which then become "property" that he or she may win or lose.
In contrast, under the facts you describe, the league does not require dues or a table fee to play in the tournaments. If the establishments are not charging a cover, offering unreasonable "specials," or charging inflated food and beverage prices, such as those described above in the discussion of consideration for a lottery, there does not appear to be a property interest offered either by the player directly or indirectly, or supplied to the players by the league or host establishment. It has been recognized that awarding prizes to the winners of a competition is not inherently gambling when the players have nothing to lose. See Op. Att'y Gen. 91-167. I do not believe that offering prizes in the situation you have described and under the assumptions made in this opinion would create a violation of A.C.A. § 5-66-112. I believe that the lack of consideration to participate in the tournament distinguishes this situation from the creation of property interests in Pre-Paid. Absent some consideration to play the game, I do not believe that a property right is created to play in the league tournaments you have described.
Consequently, in my opinion, in the specific situation you have described, there does not appear to be a lottery under the constitutional prohibitions on lotteries, illegal gambling under the statutory prohibition on gambling, or the illegal exhibition of gaming devices when an amateur poker league accepts a fee from host establishments to run poker tournaments at no cost to the participants in the tournaments and award prizes to the top participants.
Question 2. Is the answer to question 1 different if the league does notaward prizes or if the value of the prizes is less than a certain dollaramount?
See answer to Question 1 above.
Question 3. Are the answers to question 1 and 2 different if thegame being played is something other than poker, such as Monopolyor Yahtzee?
In my opinion, the answers to Question 1 and Question 2 would remain the same. The only difference between the first two questions and the third question you have posed is the game or contest being played.
With respect to the constitutional prohibition on lotteries, this would only affect whether the game was based solely on chance in the distribution of prizes. That remains a fact question to be decided by a court of law. If the situation remains as you have described it except for the game of poker being replaced with the game of Monopoly or Yahtzee, then it does not appear to violate the constitutional prohibition on lotteries or the anti-gambling statutes for the same reasons described above, i.e. the absence of consideration required to play. With respect to the statutory prohibition on gambling, A.C.A §5-66-112 would no longer be applicable, but A.C.A. § 5-66-113 (Repl. 1997) would apply. It states:
 If any person shall be guilty of betting any money or any valuable thing on any game of hazard or skill, he shall on conviction be fined in any sum not less than ten dollars ($10.00) not more than twenty-five dollars ($25.00).
A.C.A. § 5-66-113 (a). The language used is substantially similar to the language of § 5-66-112. This would result in the same analysis offered above, assuming nothing of value is wagered and no consideration to participate is supplied.
Assistant Attorney General Joel DiPippa prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JMD/cyh
[1] One of my predecessors previously opined that it would require a factual finding by a court of law to determine whether video poker and was considered to be a game of chance subject to the constitutional prohibition on lotteries. Op. Att'y Gen. 98-107. As noted in Op. Att'y Gen. 98-107, there are divergent opinions from other courts in the United States as to whether video poker is a game primarily of skill or primarily of chance. Id. (reviewing various holdings regarding whether video poker is a game of skill or chance).